# AFFIDAVIT IN SUPPORT OF A WARRANT APPLICATION UNDER RULE 41

I, Michael Grys, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2) I am a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been assigned to the office of the Assistant Special Agent in Charge (ASAC) Nogales, Arizona (AZ) since March 2018. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of Federal law to include the enforcement of Federal narcotics laws, Immigration laws, the Money Laundering Control Act, and various Customs Violations.

3) I graduated from the Criminal Investigator Training Program and the HSI Special Agent Training Program, both of which are conducted at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. At this institution, I received specialized training to include, but not limited to, the following areas: narcotics investigations, immigration investigations, fraud investigations, cyber investigations, import/export investigations, child pornography investigations, financial investigations, firearms training, defensive tactics, surveillance and undercover operations. Prior to joining HSI, I was a Border Patrol Agent in Casa Grande, Arizona for approximately six and a half (6.5) years. In 2011 I attended the United States Border Patrol Academy held at the Federal Law Enforcement Training Center in Artesia, New Mexico.

4) During my tenure with HSI, I have participated in investigations involving the unlawful importation and distribution of controlled substances. I have conducted

physical surveillance, reviewed recorded conversations and records of drug traffickers. My responsibilities include conducting investigations into drug smuggling organizations and individuals who derive substantial income from the illegal importation, manufacture, distribution and sale of controlled substances. As a Special Agent, I am responsible for investigating and enforcing violations of federal law to include the enforcement of federal drug laws, the Money Laundering Control Act, and various Customs and Immigration violations.

    5)    Through training and experience I know:

    a)    That drug smuggling organizations involved in the transporting of illegal narcotics often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities, to avoid detection of these assets by governmental agencies;

    b)    That even though these assets are in names of others than the smugglers, the drug smuggling cell actually own and continue to use these assets and exercise dominion and control over them;

    c)    That drug smuggling organizations frequently maintain on-hand large amounts of U.S. currency in order to maintain and finance their ongoing illegal business;

    d)    That drug smuggling and drug trafficking organizations maintain books, records, receipts, notes, ledgers, receipts, notes, personal computers, computer peripherals, modems, computer printers, floppy disk drives, hard disk drives, floppy diskettes, computer software, computer programs, airline tickets, money orders and other papers relating to the transportation, ordering, selling, and distribution of controlled substances. That drug smuggling organizations commonly charge a certain dollar amount in advance and then require further payment once the illegal drugs have successfully been smuggled into the United States. The aforementioned books, records, computer equipment, notes, ledgers,

etcetera, are maintained where the drug dealers have ready access to them; it is common for drug traffickers to maintain these books, records, computer equipment, notes, ledgers, and other indicia of drug trafficking for extended periods of time, long after the illegal activities related activities may have ceased;

e) That it is common practice for large scale drug smuggling organizations to secret their methods, proceeds of drug smuggling and records of financial transactions in secure locations within their residence, their vehicles, their business, or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

f) That it is common for persons involved in drug smuggling to maintain evidence pertaining to their obtaining, secreting, transferring, concealment, and/or expenditure of proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit keys, and money wrappers.  These items are maintained by the smugglers within their residences, vehicles, businesses, or other locations over which they maintain dominion and control;

g) That drug smuggling organizations often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in items a, b, c, d, e, and f;

h) That drug smuggling organizations commonly use cellular telephones to communicate with their smuggling associates and to facilitate the commission of their illegal offenses. Such as communicating with "scouts" or "lookouts" to monitor law enforcement activity on the routes they utilize for drug smuggling

operations. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of narcotics associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the drug smuggling operation, associates and/or activity, all of which can be used to identify and locate drug smuggling associates, to identify methods of operation of the drug smuggling organization, and to corroborate other evidence obtained during the course of the current investigation;

      i)    That drug smuggling organizations commonly maintain addresses or telephone numbers in books, papers, cellular telephones, and PDAs which reflect names, addresses and/or telephone numbers of their associates in the smuggling organization;

      j)    That drug smuggling organizations commonly utilize electronic paging devices, cellular telephones, radio telephones and telephones scrambling devices in attempts to maintain secure communications between drug smugglers, scouts, and customers.

      k)    That drug smuggling organizations take, or cause to be taken, photographs and videos of themselves, their associates, their property and their drugs. That these drug smuggling organizations usually maintain these photographs within their possession, in their residences, vehicles, businesses, cellular telephones, or other locations which they maintain dominion and control over; and

    6)    This affidavit is based on information which is personally known by me or which I learned from other law enforcement agents. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7) The property to be searched is a LG (LM-K500MM), which is assigned International Mobile Equipment Identifier (IMEI) 355041-61-681045-8 (Target Smartphone). The Target Smartphone was in ULTSCH's possession at the time of the encounter with law enforcement. The Target Smartphone is further described in Attachment A. The Target Smartphone is currently secured in the evidence vault at the HSI Nogales office located in Rio Rico, Arizona.

8) The applied-for warrant would authorize the forensic examination of the Target handset for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9) On April 3, 2021, at approximately 1920 hours, Craig Trandon ULTSCH presented for entry at the DeConcini Port of Entry via the vehicle lane. ULTSCH was traveling with his girlfriend, Bridget DECOT, his two-month old child, T. U., and DECOT's family friend Tia ZOCCOLA. ULTSCH was the passenger of the vehicle registered to and driven by ZOCCOLA. The vehicle was referred to secondary inspection due to a computer-generated alert on DECOT for previously transporting fentanyl pills. A pedestrian certified K-9 handler was requested to run a search of all of the vehicle's occupants. DECOT and ULTSCH were asked if she had anything hidden on her person, which both denied. The K-9, which is trained in the detection of controlled substances, alerted to ULTSCH and DECOT's waistline areas. CBPOs received approval for a partial search of DECOT and ULTSCH. The pat down search of DECOT yielded two packages of suspected fentanyl pills concealed on DECOT's person, with a total weight of 136.1 grams. One package was found on DECOT's waistband and one was found concealed within her vagina. A pat down search of ULTSCH yielded negative results.

10) During the subsequent interview of DECOT, she stated the drugs found on her person were concealed there at the direction of ULTSCH. The fentanyl pills were drugs that were compensation for drugs ULTSCH had previously supplied dealers in Mexico with. DECOT further stated that ULTSCH was transporting narcotics on his rectum. DECOT stated she put the drugs in ULTSCH's rectum prior to departing Mexico for the United States. ULTSCH was the last person in the vehicle. DECOT stated there was a brief time lapse from when DECOT left the residence and when ULTSCH left the residence to get in the vehicle before departing for the United States.

11) DECOT consented to a search of her cellular phone. She showed agents that on March 30, 2021, DECOT sent six WhatsApp picture messages to a contact listed as "R", with the phone number of 520-523-0407. The pictures are of multiple AR-15 style assault rifles. Picture 1 appeared to be a picture looking down the barrel of a rifle; in the background of the picture inside of a car door is visible. Picture 2 appeared to be a single AR-15 with a pistol brace sitting on the seat of a vehicle. Picture 3 appeared to be two bullets; one appeared to be a .22 LR and the second was an unknown caliber. Picture 4 appeared to be six AR-15 assault rifles. Four of the rifles appear to have pistol braces attached to a short barrel rifle (below 16 inches in length). Picture 5 and 6 appeared to be close up pictures of an AR-15.

12) On April 4, 2021, further consensual search of DECOT's telephone revealed multiple WhatsApp messages between ULTSCH (520-526-3307) and DECOT. On March 13, 2021, DECOT and ULTSCH exchanged a picture, of what appeared to be a large pile of m-30 fentanyl pills. The exchange showed three additional pictures of the pills organized into multiple rows of five pills on a clear glass table. Only the pictures were exchanged, an no written communication was present.

13) On March 14, 2021, DECOT and ULTSCH exchanged a picture of a Western Union receipt. Juan Marcos MERCED, 547 Joseph Avenue, Rochester, New York transferred an unknown amount of cash to ULTSCH, from Chester's Check Cashing, 882

North Clinton Avenue, Rochester, New York.  The tracking number on the transaction was 231-501-3169.

14)     On March 15, 2021, DECOT and ULTSCH exchanged another picture of similar m-30 fentanyl pills, evenly organized in rows of five pills on a glass table, similar to the picture exchange on March 13, 2021.  The following text exchange occurred:

DECOT: 999 ½

DECOT: 100 what?

DECOT: Megan is here and wants a ball fo g but I think we can maybe do a gm so how much do you want for it?

ULTSCH responded with following audio messages, the messages are in summary.

Audio message from ULTSCH: Cowboy wants 100 blues; he will come to you when he gets done at Desert Diamond.

Audio message from ULTSCH:  Shannon BROWN has $70 bucks, she is asking if you will do her a favor, its like a five-dollar difference.

Audio message from ULTSCH: Junior is waiting on those 30 xans, he also wants a 30 of black, so whenever you can get ahold of Lenny and he can get over to you and give you that call Junior and he can come to you or you can go to him.

DECOT: Sent me jr, shannon and cowboy number

ULTSCH sent pictures with the contact information for junior, shannon, and cowboy, the numbers were as follows:

Jr Chef: 1-520-912-7470

Cowboy: 1-520-530—8037

SB: 1-520-530-8441
Ul

15) The Target Smartphone was found on ULTSCH's person at the time of the encounter with Customs and Border Protection officers. The Target Smartphone was seized as evidence of the crime based on information received by DECOT and a consented search of DECOT's cellular telephone. DECOT agreed to place a telephone call to the Target Smartphone, with the phone number provided in the WhatsApp messages (520-526-3307), to verify the phone was in fact the Target Smartphone seized from ULTSCH. When dialed, the Target Smartphone activated, reflecting that DECOT had provided the correct phone number.

## TECHNICAL TERMS

16) Based on my training and experience, I use the following technical terms to convey the following meanings:

    a) <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b) <u>Digital camera</u>: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety

8

of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

        c)     <u>Portable media player</u>: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d)     <u>GPS</u>: A GPS navigation device uses the Global Positioning System (GPS) to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e) <u>PDA</u>:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f) <u>Tablet</u>:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g) <u>Pager</u>:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h) <u>IP Address</u>: An Internet Protocol (IP) address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and

directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

  i) <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  17) Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Smartphone has capabilities that allows it to serve as a wireless telephone, receive and send email, instant messaging, a digital camera, and serve as a GPS navigation device.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

  18) Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

  19) *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Smartphone was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on the Target Smartphone:

    a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b)	Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)	A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)	The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)	Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20)	*Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Smartphone consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the Target Smartphone to human inspection in order to determine whether it is evidence described by the warrant.

21)	*Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22)   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Smartphone as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

**Michael.J.Grys** Digitally signed by Michael.J.Grys
Date: 2021.04.29 14:47:23 -07'00'

Michael Grys, Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically
on April 29, 2021:

_____
UNITED STATES MAGISTRATE JUDGE
LYNNETTE C. KIMMINS

**ATTACHMENT A**

The property to be searched is:

One (1) black LG cellular telephone, model number "LM-K500MM", assigned International Mobile Equipment Identity (IMEI) number "355041-61-681045-8", currently in the custody of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). Below are photographs of the cellular phone:



# ATTACHMENT B
# DESCRIPTION OF ITEMS TO BE SEARCHED FOR

1. Data and/or digital files stored on or accessed through the Target Smartphone (as described in Attachment A) relating to drug-trafficking, wherever it may be stored or found, specifically including:

    a. lists of customers and related identifying information;

    b. dates, places, and specific number of aliens to be smuggled and transported;

    c. locations, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

    d. any information related to sources of money or alien smuggling (including names, addresses, phone numbers, or any other identifying information);

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. Electronic correspondence stored on or accessed through the Target Smartphone relating to alien smuggling, to include emails and attached files, text messages, and instant messaging logs.

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Smartphone.

4. Contact lists stored on or accessed through the Target Smartphone, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5. Evidence of persons who used, owned, or controlled the Target Smartphone.

6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Smartphone.